**OTIS ELEVATOR CO. v. JOHN W. KIESLING & SON, Inc.**

**Civ. No. 9668.**

United States District Court
E. D. New York.

Oct. 31, 1949.

Watson, Bristol, Johnson & Leavenworth, New York City, for plaintiff. By Clair V. Johnson, New York City, of counsel.

Pennie, Edmonds, Morton & Barrows, New York City, for defendants. By Willis H. Taylor, Jr., J. Philip Anderegg, and John T. Farley, New York City, of counsel.

INCH, Chief Judge.

This is a patent suit. Plaintiff owns the Lindquist, et al. patent No. 1,904,647, issued April 18, 1933, which will expire April 18, 1950. This patent has been held valid in litigation between plaintiff and other parties, Otis Elevator Company v. 570 Building Corporation, et al. Staley Elevator Co., Inc., Intervenor, 2 Cir., 1938, 98 F.2d 699, and its validity is conceded by defendant in this suit.

Plaintiff, by its original complaint, claims that defendant has sought to infringe its Lindquist patent by a proposed elevator to be installed for the New York City Housing Authority at its project Nostrand Houses, New York City. Such proposed infringement is denied by defendant. That is the real controversy in this trial.

After filing this original complaint plaintiff learned of an actual infringement by this defendant who had installed an elevator in the Court Square Building, Long Island City, N. Y. and duly filed and served an amended complaint. As to this actual infringement by defendant, there would seem to be little more to be said as the defendant not only concedes the validity of the Lindquist patent, but also that it was so infringed by defendant. There must be judgment, therefore, for plaintiff in regard to this Court Square elevator in the building Forty-Fifth Road, Long Island City, N. Y.

There also seems to be agreement between the parties as to the elevators installed by defendant for the Mt. Vernon Housing Authority, Mt. Vernon, N. Y., and the White Plains Housing Authority, White Plains, N. Y. (which are down collective elevators like the Nostrand Houses) should such an elevator be found to infringe plaintiff's patent, as is contended in this suit by plaintiff, that judgment will also be for plaintiff as to such installations by defendant.

Plaintiff, Otis Elevator Company, is a New Jersey corporation, and since 1853 has been one of the leading elevator manufactures in the United States. Defendant, John W. Kiesling & Son, Inc., is a New York corporation, which has been engaged for many years in manufacturing elevators, such as dumbwaiters, car switch, freight and passenger elevators, and automatic push button passenger elevators of a non-infringing type. It is a fair inference that each of these parties had knowledge of the existence of the patents involved in this controversy, and that such knowledge existed at the time of the alleged infringements and actual infringement above referred to.

We now come to the issue litigated, which relates to this threatened infringement in the Nostrand Houses. This arose as follows: the New York Housing Authority (Project 11, Tract 10) sought bids, based on specifications issued by it, which called for a "down selective collective" elevator, that is, selective collective only on the downward trip of the elevator. Plaintiff was the successful bidder, and previously had notified defendant that defendant's proposed bid would infringe the Lindquist patent. Inasmuch as plaintiff obtained the contract it is difficult to see what damages it has suffered from this bid of defendant. In fact, I do not see that any damages are involved, nor does counsel for plaintiff seek damages as to the Nostrand Houses. Plaintiff asserts that it was damaged by the Court Square, Mt. Vernon and White Plains installations by defendant. (Plff's. Ex. 33). Plaintiff, however, should this threatened infringement be found, is entitled to the usual injunctive relief for protection in case of future infringement, as its Lindquist patent will not expire until April, 1950.

In examining the somewhat large record before me, there are certain matters which seem to me to be immaterial, or not necessary for a decision of the real merits of this controversy, such as the fact that the Larson patent, No. 1,694,823, had been owned by plaintiff and was co-pending with Lindquist, it was granted December 11, 1928, and duly expired in 1945, the allega-

tion that plaintiff has here used its Lindquist patent in an unlawful way so as to violate the Clayton and Sherman Acts, 15 U.S.C.A. §§ 1 et seq., 12 et seq., and finally the matter of Thompson, who manufactured non-infringing apparatus. Nor do I think that the Kinnard modification is any obstacle to a decision as to whether or not the proposed elevator of the Larson type would infringe the claims of Lindquist, et al. The Larson patent was present and discussed in the suit of Otis v. 570 Building Corporation, et al., supra. Starting, therefore, with the specifications issued by the New York City Housing Authority for the Nostrand Houses, it is apparent that they called for, as I have above mentioned, a down selective collective elevator, that is, selective collective only on the downward trip of the elevator.

Defendant claims that it proposed to furnish such an elevator by following the expired Larson patent and the specifications of the said Housing Authority. Plaintiff claims that the Larson elevators are a one-button "non-selective collective automatic" elevator, and that something else would have to be added to make it conform with the specifications, and that this addition would be an infringement of the Lindquist patent.

Counsel for plaintiff say in their brief, defendant is not content merely to follow Larson, or to wait a few months more until the Lindquist patent expires, before going on to the down collective field.

The claims of Lindquist, relied on by plaintiff to prove the threatened infringement, are as follows:

Claim 1

(1) A control system for an elevator car comprising, (a) car actuating and stopping mechanism, (b) control means for each of a plurality of floors, (c) means responsive to the operation of any one of the control means for causing the operation of said mechanism to start the car, and (d) means responsive to all the control means operated for causing the operation of said mechanism to stop the car, only when it is traveling in a certain direction, (1) at the floors corresponding to the control means operated, (2) in the natural order of floors, regardless of the order in which the control means are operated.

Claim 2

A control system for an elevator car comprising, (a) car actuating and stopping mechanism, (b) a switch for each of a plurality of floors, (c) means responsive to the first of said switches operated for causing the operation of said mechanism to start the car, and (d) means responsive to all the switches operated for causing the operation of said mechanism to stop the car, only when it is traveling in a certain direction, (1) at the floors corresponding to the switches operated, (2) in the natural order of floors, regardless of the order in which the switches are operated.

Claim 3

A control system for an elevator car comprising, (a) car actuating and stopping mechanism, (b) a switch for each of a plurality of floors, (c) means responsive to the operation of any one of said switches for causing the operation of said mechanism to start the car, (d) means responsive to all the switches operated for causing the operation of said mechanism to stop the car, only when it is traveling in a certain direction, (1) at the floors corresponding to the switches operated, (2) in the natural order of floors, regardless of the order in which the switches are operated, and (e) automatic means for causing the operation of said mechanism to start the car after each stop so long as switches remain unresponded to.

Claim 20

A control system for an elevator car comprising, (a) a switch for each of a plurality of floors, (b) means responsive to the operation of any one of said switches to cause the starting of the car, (c) means responsive to all the switches operated to cause the car, when traveling in a certain direction, to stop successively at the floors corresponding to the switches operated, and (d) means for preventing the response of the second named means to said switches when the car is traveling in the other direction.

Claim 21

A control system for an elevator car comprising, (a) a switch for each of a plurality of floors, and (b) means responsive to the operation of said switches, with the car traveling in a certain direction when the switches are operated, for causing the car to proceed in the other direction after a stop at a terminal floor (1) and thereupon to stop successively at the floors corresponding to the switches operated.

Claim 22

A control system for an elevator car comprising, (a) a switch for each of a plurality of floors, (b) means responsive to the operation of said switches, with the car traveling in a certain direction when the switches are operated, for causing the car to proceed in the other direction after a stop at a terminal floor (1) and thereupon to stop successively at the floors corresponding to the switches operated, and (c) means for preventing the response of the first named means to said switches to stop the car when it is traveling in said certain direction.

It seems to me that these claims adequately cover and teach the mechanisms producing the invention of Lindquist, and as indicated by Exhibits 10, 16A-F and 14, providing means, in accordance with the specifications of the Nostrand Houses elevator, and, as disclosed by Lindquist, for causing the Lindquist elevator to bypass all calls at intermediate floors when traveling "up" and causing it to return in a "down" direction "collecting" such calls successively in the natural order of the floors, regardless of the sequence in which the calls were registered.

Defendant asserts that its proposed elevator would not infringe any of these claims of Lindquist relied on by plaintiff, because its proposed elevator is one in ac-accordance with the Larson expired patent in due accordance with the specifications required in the Nostrand Houses.

Much ado is made by defendant as to an alleged important difference between the "one-button" of Larson, and the "two-button" elevator of Lindquist, but this question of mere buttons fails to be of any importance when the real question of infringement is determined. To be sure, the two-button full selective collective elevator of Lindquist is like the Staley elevator, which has already been held elsewhere to infringe Lindquist, (Otis Elevator Company v. 570 Building Corporation, supra,) and Larson is a single button elevator for all travel. The difficulty with this argument of defendant is that the Court of Appeals of this Circuit has already determined that [98 F.2d 700] "the Larson patent relates to an elevator to be operated by what is called 'non-selective collective automatic operation', * * *" while "the Lindquist patent relates to elevators to be operated by 'selective collective automatic operation.'"

The real objection earnestly raised by counsel for defendant seems to me to be that plaintiff here cannot confine its claims to a single button for a down elevator, yet the New York City Housing Authority specifications specifically called for a down selective collective system, that is, a selective collective on the downward trip of the elevator only. This defendant, in my opinion, if Larson alone is relied upon by it, would have proposed a non-selective collective automatic elevator to produce an elevator that must be selective collective on the downward trip. The teaching of the claims of Lindquist, therefore, must be added to Larson in order to conform with the specifications. Larson would pick up calls the first time it came to the floor, regardless of which direction it is travelling in, Lindquist will pick them up and collect them only when it is travelling in one direction. In other words, calls that are subsequently picked up on the down trip are bypassed on the up trip, and the car is selective with respect to those. It is not the mere pressing of a button, or a down button, that makes the elevator selective, it is what the elevator will do in response to the push of a button, and it is not the indication on the part of a passenger which determines whether the elevator is "non-selective collective", or "selective collective" in operation. I agree with counsel for plaintiff that this is the whole significance between the one and two buttons. It is not without significance that Larson and Lindquist were co-pending and

that after Larson was granted a patent, Lindquist subsequently was also granted a patent, and I do not find that by limiting, for the purpose of the specifications, Lindquist to a "down button" that the claims of Lindquist relied on were improperly or unfairly broadened. The teachings of Lindquist remain effective because it shows "a selective collective system down," which is something that Larson does not teach. The Court of Appeals has already decided that Larson is a non-selective automatic operation. Under Larson the elevator will stop at intermediate floors going up and going down, whereas Lindquist will register the down button pushed when travelling up, but will not stop, but later, coming down, will select and collect passengers wanting to go down.

The validity of Lindquist is, as I have said, conceded by defendant. A reading of the examination of Hellmuth, the patent expert for defendant, is not convincing and is often uncertain as to the actual absence of infringement. I do not think that plaintiff's contention here is an improper broadening of the Lindquist claims, or that they have to be redrawn by the Court in order to apply. On the contrary, as counsel for plaintiff states, there is no objection by plaintiff to defendant installing a Larson elevator, but there is decided objection to its installing elevators covered by the Lindquist patents, which are selective collective automatic in operation, whether up or down, in this case, down.

It is interesting to note that the Housing Authority in the Nostrand Houses, after apparent research, decided that most, if not all of the traffic, outside of the first floor hall, is in the down direction, and that this was the reason for the specifications for an elevator requiring a selective collective elevator in a down direction only. In my opinion, the proposed elevator of defendant infringes the claims of Lindquist, and such infringement has been duly proved. There will be, as requested, no damages allowed plaintiff in the case of the Nostrand Houses. There will be the usual injunction against future infringement. There remains the question of damages in the case of the Court Square Building,

where validity and infringement is conceded, and in the cases of Mt. Vernon and White Plains, where defendant installed elevators of the same type as it proposed in the Nostrand Houses. Damages are governed by Title 35 U.S.C.A. § 70. In substance where reasonable certainty cannot show damages, the court may take expert testimony, but if this is unnecessary, the "court may adjudge and decree the payment by the defendant to the complainant of a reasonable sum as profits or general damages for the infringement." In this regard, plaintiff has referred to its Exhibit 33, which shows that the net price of the Court Square elevator was approximately $8,000 and in the Mt. Vernon and White Plains Housing Authority, was approximately $132,000, making a grand total of approximately $140,000 after it had knowledge of the Lindquist patent, and that plaintiff would not give a license for such installations. It asks for at least twenty-five percent of this amount, which, in round figures, is $35,000. The defendant, while asserting that there was no infringement, and therefore no reason to pay any damages, meets this computation of plaintiff by saying that in any event it should be only in an amount equivalent to a three percent royalty, that the twenty-five percent figure was arrived at by plaintiff because of a penalty clause in connection with one of its licenses, and that this was not a royalty figure at all, that its standard royalty would be in the nature of three percent.

I am not prepared, on the record before me, to definitely fix the amount of damages under the circumstances here presented. It is my hope that the parties may agree on the amount thereof for the purpose of this trial, but if it will be of any assistance, I can state that, in my opinion, twenty-five percent is too high, and that three percent is too low, for the reason that this would mean one could infringe with impunity even if it has no license, and then when found to be an infringer, pay only that which a license would have required. Ten or fifteen percent would obviate this criticism as a business proposition, and the evidence will support what I find to be the

reasonable damage. However, if the parties cannot agree, I will accomodate them so that this question may be presented at such time as may be mutually convenient, when the proposed final judgment and decree is presented for signature.

Judgment and decree for plaintiff in accordance with the above.